1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARTIN WARE,                           No.  2:12-cv-1505 TLN KJN P

12              Plaintiff,

13       v.                                 FINDINGS AND RECOMMENDATIONS

14   M. McDONALD, et al.,

15              Defendants.

16

17   I.  Introduction

18          Plaintiff is a state prisoner, proceeding without counsel.  Plaintiff claims defendants

19   Hanks, Green, Tancreto, Fackrell, Holt, Giessner, and Glover violated his Eighth Amendment

20   rights, and contends defendants intentionally inflicted emotional distress in violation of state law.[1]

21   Defendants' motion for summary judgment, and plaintiff's counter-motion for partial summary

22   judgment, are before the court.  As set forth more fully below, the undersigned finds that

23   defendants' motion for summary judgment should be granted in part and denied in part, and

24   plaintiff's motion for partial summary judgment should be denied.

25   II.  Plaintiff's Verified Third Amended Complaint

26          Plaintiff alleges the following:

27   _____

28   [1]  Plaintiff's First and Fourteenth Amendment claims against defendants were dismissed on
     November 21, 2013.  (ECF No. 49; see also ECF No. 43.)

                                              1

While housed at High Desert State Prison ("HDSP") in Susanville, California, and sometime prior to June 4, 2011, defendant Sgt. Hanks[2] enforced an administrative review into the housing needs of plaintiff and inmate Jose Beltran. (ECF No. 41 at ¶ 1.) After interviewing plaintiff, defendant Hanks determined Beltran posed a threat to plaintiff, and Hanks ordered that plaintiff be separated from Beltran and Beltran be transferred to a different housing unit "due to Beltran having attempted to cause violence against plaintiff while living in B-1 cell 116." (ECF No. 41 at ¶¶ 2-3.) Plaintiff claims defendant Hanks failed to protect plaintiff by failing to properly classify plaintiff. (ECF No. 41 at ¶ 4.)

On or about June 4, 2011, during an escort, defendant Green was placed on notice that plaintiff was vulnerable to living with the inmate in cell 203,[3] and that plaintiff would refuse a direct order to accept his new cellmate. (ECF No. 41 at ¶¶ 5-6.) Defendant Green determined plaintiff had enemy concerns, but Green "advised he did not know the inmate in cell [202]." (ECF No. 41 at ¶ 7.) Plaintiff alleges defendant Green denied plaintiff's request to identify an enemy. (ECF No. 41 at ¶ 8.)

On or about June 4, 2011, after plaintiff arrived at housing unit building two, defendant Tancreto was notified by plaintiff that he planned to refuse a direct order for accepting his new cellmate. (ECF No. 41 at ¶¶ 8-9.) Defendant Tancreto determined plaintiff had enemy concerns, but Tancreto "advised he did not know the inmate in cell [202]." (ECF No. 41 at ¶ 11.) Plaintiff alleged that defendant Trancreto denied plaintiff's request to identify an enemy. (ECF No. 41 at ¶ 12.)

Plaintiff was then placed in restraints and escorted to the program officer for housing review. (ECF No. 41 at ¶ 13.) A supervisor interview was conducted with correctional employees from both housing unit buildings two and three. (ECF No. 41 at ¶ 14.) Plaintiff alleges defendant Hanks denied plaintiff a private interview so he could identify enemy concerns in violation of prison policy. (ECF No. 41 at ¶ 15.) Upon arrival at Facility B program office, plaintiff was placed in a holding cage where defendant Tancreto questioned plaintiff as to the reasons plaintiff refused to accept his cellmate. (ECF No. 41 at ¶ 16.) Plaintiff placed Tancreto "on notice" a second time that plaintiff was refusing to accept the SNY-inmate in cell 202 as his new cellmate because he had threatened plaintiff's safety in the past. (ECF No. 41 at ¶¶ 17-18.) Defendant Tancreto denied plaintiff's request to be classified as a victim, and took administrative action alleging plaintiff disobeyed a direct order. (ECF No. 41 at ¶¶ 19, 22.) Plaintiff requested that defendant Tancreto report this information to the program office administrators because plaintiff "could no longer reside safely on Facility Bravo." (ECF No. 41 at ¶ 20.) Plaintiff repeated his safety concerns, and requested he be removed from cell 202 to the administrative segregation unit ("ASU") so that the Warden could review the case. (ECF No. 41 at ¶ 21.)

On or about June 4, 2011, defendant Hanks interviewed plaintiff, while held in the holding cage, as to the reasons plaintiff was refusing his cellmate, and plaintiff informed Hanks that he was incompatible with the cellmate in 202, that this inmate posed a threat to plaintiff's safety while housed on Facility Bravo, and plaintiff wanted to be placed in the ASU. (ECF No. 41 at ¶¶ 23-25.) Defendant Hanks then determined the inmate in cell 202 posed no serious threat because plaintiff was unable to identify valid enemy concerns. (ECF No. 41 at ¶ 26.) Plaintiff claims Hanks denied plaintiff's right to be classified as a victim. (ECF No. 41 at ¶ 27.)

---

[2]  Although plaintiff named W. Hank as a defendant, defendants have identified this individual as W. Hanks.  The undersigned refers to defendant Hanks herein.

[3]  In his pleading, plaintiff refers to the proposed new cell number as 203, but in the briefing pertinent to the pending motion, the parties refer to plaintiff's new cell number as 202.  Therefore, the undersigned will hereafter refer to cell number 202.

1        Next, defendant Fackrell ordered plaintiff to be housed in cell 202. (ECF No. 41 at ¶¶ 28-29.) Plaintiff notified defendant Fackrell that plaintiff could not be physically forced into a cell with an incompatible inmate who had threatened to assault plaintiff in the past. (ECF No. 41 at ¶ 29.) Defendant Fackrell determined plaintiff did not have valid enemy concerns, and denied plaintiff's right to be protected from other SNY-inmates. (ECF No. 41 at ¶¶ 30-31.)

At approximately 10:40 a.m., on or about June 4, 2011, defendants Holt, Green and Tancreto "lead a two-on-one physical control hold." (ECF No. 41 at ¶ 33.) Defendant Holt allegedly ordered that plaintiff be physically forced into cell 202, and allegedly used excessive force in doing so. (ECF No. 41 at ¶ 34.) Plaintiff then recalled the name of the inmate in cell 202, "Beltran," and told Holt about a prior incident where Beltran retaliated against plaintiff, requiring officers to pepper spray Beltran. (ECF No. 41 at ¶ 35.) Defendant Holt allegedly denied plaintiff's request to classify enemies. (ECF No. 41 at ¶ 37.) During the use of force, plaintiff was kicked in the heels, thrown to the ground, punched in the jaw and collarbone, and elbowed in the hip. (ECF No. 41 at ¶ 61.) Defendants Holt and Green allegedly attempted to break his fingers. (Id.)

Defendant Hanks conducted a use of force interview at the sergeant's office where defendant Glover videotaped plaintiff's injuries, and plaintiff informed Glover of the injuries and the alleged use of excessive force. (ECF No. 41 at ¶¶ 39-40.) Defendant Hanks determined Beltran and plaintiff were not enemies, and denied plaintiff's request to identify an enemy, a complete use of force interview, and the ability to gather additional information. (ECF No. 41 at ¶¶ 41-42.)

Defendant Fackrell then ordered defendants Giessner and Glover to "lead a two-on-one physical control hold in a second attempt without the use of restraints" to house plaintiff in cell 202. (ECF No. 41 at ¶ 44.) Defendant Fackrell allegedly authorized the use of force, and instructed Giessner and Glover to take plaintiff to the ground if there were any problems. (ECF No. 41 at ¶ 44.) Plaintiff put defendant Giessner on notice that Beltran had threatened plaintiff's safety in the past, and thus Giessner allegedly put plaintiff's life in danger by ordering plaintiff into cell 202. (ECF No. 41 at ¶ 48.) Plaintiff alleges that Giessner and Glover used "deadly" and "unnecessary" force by dropping him to the ground and pinning him down on his left side, injuring his temple, shoulder, and jaw. (ECF No. 41 at ¶ 65.) Plaintiff alleges defendant Giessner determined plaintiff alleged safety concerns, but Giessner did not provide appropriate instruction in case the inmate in 202 was inmate Beltran, and denied plaintiff's request to identify a classified enemy. (ECF No. 41 at ¶¶ 49-50.)

At approximately 12:38 p.m., defendant Hanks responded to an alarm in the housing unit, and plaintiff informed him that Beltran attempted to assault plaintiff as the cell door opened. (ECF No. 41 at ¶ 51.) Plaintiff alleges defendant Hanks determined plaintiff had enemy concerns, but failed to complete a second use of force interview. (ECF No. 41 at ¶ 52.)

Finally, plaintiff alleges that defendants Hanks, Fackrell, Green, Tancreto, Holt, Giessner, and Glover intentionally inflicted emotional damage by their failure to enforce prison policies and to properly investigate plaintiff's enemy concerns, and should have known their conduct would cause plaintiff to suffer emotional distress, mental pain, anguish and suffering, and humiliation. (ECF No. 41 at ¶ 76.)

III.   Plaintiff's Motion for Partial Summary Judgment

On February 5, 2016, plaintiff filed a 289 page motion for partial summary judgment. Plaintiff states that he was "assaulted by prison staff," "denied adequate medical care," "punished without the due process of law," and "wrongfully convicted of serious disciplinary charges."

1  (ECF No. 97 at 1.)  Plaintiff states he seeks partial summary judgment on his claim of denial of

2  due process, but does not move for summary judgment on his remaining claims because there are

3  clear disputes of fact.  (Id.)  Plaintiff goes on to discuss the medical care he was provided, the

4  alleged due process violations that occurred during the disciplinary hearing, as well as two

5  incidents involving the use of force.  (ECF No. 97 at 2-20.)  In conclusion, plaintiff argues that

6  his "undisputed facts establish that defendants Dr. Lankford, C.F. Bolls and Warden McDonald

7  denied [his] rights to due process of law."  (ECF No. 97 at 20.)

8         First, Lankford, Bolls and McDonald are not named as defendants in plaintiff's third

9  amended complaint.  (ECF No. 41.)  These individuals have not been served with process or

10  appeared in this action.  Second, as set forth above, this action is not proceeding on any due

11  process or inadequate medical care claims.  Plaintiff may not seek summary judgment on due

12  process or medical claims not raised in the operative pleading.  Therefore, plaintiff's motion for

13  partial summary judgment should be denied.

14  IV.  Defendants' Motion for Summary Judgment

15         Defendants move for summary judgment on the grounds that defendants did not fail to

16  protect plaintiff from a known enemy in violation of the Eighth Amendment; defendants did not

17  use excessive force against plaintiff on June 4, 2011; plaintiff's failure to comply with the

18  Government Torts Claim Act bars plaintiff's state law claim; and defendants are entitled to

19  qualified immunity.

20         Plaintiff's Opposition

21         Plaintiff contends that there are material disputes of fact that preclude entry of summary

22  judgment.  Due to a prior incident between plaintiff and inmate Beltran on April 10, 2011,

23  defendants should have been aware that plaintiff was incompatible with inmate Beltran, and

24  should not have attempted to house plaintiff with inmate Beltran, and provided a copy of the

25  April 10, 2011 incident report (ECF No. 98 at 12-98).  After the April 10, 2011 incident, plaintiff

26  and inmate Beltran were separated and transferred to different buildings.  (ECF No. 98 at 5.)

27  Defendants "should have verified whether computer data confirm any inferences supported by

28  plaintiff's past-housing needs and investigated entirely prior housing assignments."  (ECF No. 99

4

at 16.)  Defendant Hanks was a supervisor involved in the April 10, 2011 incident report, and, from the program office, ordered plaintiff to return to his assigned housing unit.  (ECF No. 99 at 17.)  Inmate Beltran threatened plaintiff's safety on April 10, 2011, and as a result Beltran received a serious rules violation report for resisting a peace officer; such report supports plaintiff's contention that a threat was made by inmate Beltran "because custody staff prevented an assault against plaintiff."  (ECF No. 99 at 17.)

Defendants Hanks and Fackrell did not complete a compatibility inquiry before or after the decision was made to escort plaintiff on June 4, 2011, because neither supervisor afforded him an opportunity to identify the incompatible inmate.  Both defendants disregarded plaintiff's reported safety concerns and failed to verify that inmate Beltran posed a risk to plaintiff's safety.  (ECF No. 99 at 17.)  Defendants did not issue plaintiff a disciplinary report for initially refusing a direct order to accept a housing assignment, as required under CDCR HDSP operation procedure #502.  (ECF No. 99 at 17, citing ECF No. 99 at 49.)  Plaintiff was not afforded an opportunity to communicate with inmate Beltran before defendant Hanks and Fackrell authorized the housing assignment.  (ECF No. 99 at 18.)

In connection with his excessive force claims, defendants Holt, Giessner, and Glover "acted with reckless disregard for plaintiff's safety, and claims they carried out such escorts to "uphold a code of silence and possibly stage a potential grudge fight, and cause plaintiff physical harm," because plaintiff was denied the ability to report safety concerns.  (ECF No. 99 at 19-20.)  Plaintiff was subjected to assault and battery during the escorts, and the medical evidence concerning his injuries will support his claims of excessive force.  (ECF No. 99 at 20.)  Defendants knew about the risk because of plaintiff's "self-reported inferences . . . that inmate Beltran was a threat and had threaten[ed] [plaintiff's] safety in the past," and defendants failed to reasonably respond to that risk, despite plaintiff's inability to recall the inmate's name or CDCR identification number.  (ECF No. 99 at 23.)  Defendants were not permitted to ignore such risk, and failed to investigate to determine whether a substantial risk existed.

Plaintiff did not resist, batter, or become combative with defendants, and contends that had he been afforded the right to refuse an incompatible cellmate, neither of the two use of force

1   incidents would have occurred.  (ECF No. 99 at 23-24.)  During the second escort, plaintiff

2   recalled the name of inmate Beltran to defendant Holt, who responded by saying, "Why didn't

3   you report that to the supervisor," "why you telling me, I don't give a fuck," and continued the

4   escort with "that kind of state of mind."  (ECF No. 99 at 24.)  Plaintiff contends that the

5   continuation of the escort after such notice demonstrates defendant Holt intentionally planned to

6   cause plaintiff serious harm.  (Id.)

7       Plaintiff initially denied the use of force interview because he wanted a confidential

8   interview, not an interview held at the holding cage.  (ECF No. 99 at 25.)  Subsequently, a use of

9   force interview was conducted in the sergeant's office.  (ECF No. 99 at 25-26.)  Plaintiff reported

10  injuries to his legs, knees, chest, shoulder, wrists, face, and neck.  (ECF No. 99 at 26.)

11      After defendant Giessner said, "Open 202," plaintiff stated, "this is Beltran the same one I

12  got into a fight with in building one, and informed Giessner, "I can't enter the cell."  (ECF No. 99

13  at 27.)  Plaintiff moved away out of fear of Beltran, not to resist the officer.

14      As to qualified immunity, plaintiff argues that the prolonged length of the escorts at issue

15  here demonstrate that defendants are not entitled to qualified immunity.  (ECF No. 99 at 24.)  The

16  supervisory defendants should not be granted immunity because they failed to report plaintiff's

17  safety concerns, and failed to investigate plaintiff's legitimate safety concerns before deciding to

18  house him in cell 202.  (ECF No. 99 at 38-44.)[4]  Defendant Hanks reported Beltran's resistance

19  against peace officers on June 4, 2011, June 5, 2011, and January 10, 2016, yet failed to mention

20  that Beltran "stood-off on plaintiff," or explain why Beltran was transferred to another building.

21  (ECF No. 99 at 43.)  Plaintiff provides a copy of the CDCR HDSP operational procedure section

22  502, which governs voluntary and involuntary double-celling.  (ECF No. 99 at 47-50.)

23      Reply

24      In reply, defendants argue that plaintiff essentially reiterated the allegations of his

---

25  [4]  On May 10, 2016, after defendants' motion was fully briefed, plaintiff filed a declaration by
    Danny Henderson.  (ECF No. 105.)  Aside from its untimely submission, Henderson's declaration
26  pertains to an incident on February 10, 2011, between plaintiff and Correctional Officer R.
    Gardner.  Gardner is not a defendant in this action, and plaintiff's pleading does not involve an
27  incident that occurred on February 10, 2011.  For all of these reasons, Henderson's declaration is
    disregarded.
28

pleading, but failed to produce any evidence to counter defendants' evidence, or to prove that defendants violated plaintiff's Eighth Amendment rights.  Plaintiff failed to produce any evidence to establish that inmate Beltran was plaintiff's enemy, or to establish that the defendants knew or should have known Beltran posed a danger to plaintiff.  Plaintiff produced no evidence that inmate Beltran was charged with threatening plaintiff.  Rather, inmate Beltran was charged with resisting a peace officer requiring the use of force, which does not give rise to an enemy designation.  (ECF No. 100 at 2.)  During his deposition, plaintiff admitted he could not recall the name or number of his alleged enemy when defendants interviewed him prior to the cell move.  Finally, defendants contend the cell door was never opened, and plaintiff was never harmed by inmate Beltran during the June 4, 2011 cell move.  (ECF No. 100 at 2.)  Thus, defendants did not fail to protect plaintiff from an inmate who was not an enemy designee.

As to the use of excessive force, plaintiff failed to submit any evidence regarding the use of force.  Plaintiff included one "single conclusory statement that he was assaulted by staff." (ECF No. 100 at 3, citing ECF No. 98 at 1-6.)  By contrast, defendants submitted evidence demonstrating that plaintiff became resistive, and defendants Green, Holt, Giessner, and Glover used force to maintain order by forcing plaintiff to the ground to apply restraints.  The force used was minimal and necessary under the circumstances, and fails to rise to the level of an Eighth Amendment violation.

Plaintiff's state law claim also fails because he did not oppose the motion and did not offer evidence that he complied with the claims presentation requirement of the California Government Claims Act.  The evidence shows that he did not.

Finally, defendants argue they are entitled to qualified immunity because no reasonable officer would have believed that moving plaintiff to a cell with another inmate who was not deemed a safety risk to plaintiff would violate a clearly established right when the evidence established that (a) none of the defendants were involved in Beltran's prior incident; (b) inmate Beltran was not designated as plaintiff's enemy; (c) a compatibility review was conducted prior to the cell move, and (d) plaintiff could not identify inmate Beltran by name or CDCR number. Thus, defendants had no reason to believe that the cell move would result in the infliction of cruel

1    and unusual punishment.  (ECF No. 100 at 3.)

2            Sur-Reply

3            By order filed July 20, 2016, the court reviewed plaintiff's sur-reply and determined that

4    only portions of the 166 page filing would be considered in ruling on the instant motion.  (ECF

5    No. 106.)  Because his previous declaration (ECF No. 98) was not signed, plaintiff was allowed

6    to file his "perfected declaration" and "affidavit."  (ECF Nos. 102, 102-1.)[5]  In all other respects,

7    his sur-reply was disregarded.  (ECF No. 106 at 2.)

8            In his "perfected declaration," plaintiff includes, *inter alia*, detailed facts concerning the

9    alleged use of force by defendant Holt during the escort by defendants Green and Holt.  (ECF No.

10   102 at 6-9.)  Plaintiff declares that after Glover's escort reached cell 202, defendant Glover yelled

11   at the control booth officer to open 202, and ordered plaintiff to move toward Giessner.  (ECF

12   No. 102 at 12.)  Inmate Beltran came to the entrance of the cell as Giessner opened the cell door.

13   Plaintiff claims that both defendants Giessner and Glover "forced" plaintiff to enter cell 202.

14   After plaintiff explained that inmate Beltran is the same inmate plaintiff got into a fight with in

15   building one, Giessner asked Beltran whether he was going to accept his cellmate, but Beltran

16   responded, "you're not my cellie," and moved toward plaintiff in an aggressive manner lifting his

17   right hand and blocking the cell entrance.  Plaintiff immediately moved away, and Giessner

18   quickly closed the cell door.  (ECF No. 102 at 13.)  Without any warning, Giessner yelled "get

19   down," yanking plaintiff off the wall.  (ECF No. 102 at 14.)  Plaintiff sets forth detailed facts

20   concerning the alleged use of force by defendants Giessner and Glover.  (ECF No. 102 at 12-15.)

21   At the subsequent rules violation hearing, where plaintiff was charged with battery on defendant

22   Giessner, plaintiff asserted that Beltran is plaintiff's enemy.  (ECF No. 102 at 17.)  Plaintiff

23   confirms that Correctional Sergeant Hays was assigned to conduct a background investigation

24   into plaintiff's enemy concerns.  (Id., citing ECF No. 97-1 at 51.)

25           In his affidavit, plaintiff declares that on April 10, 2011, defendant Hanks, facility

26   supervisor, responded to a code alarm.  (ECF No. 102-1 at 1.)  Plaintiff declares that he was

27

28   _____
     [5]  Plaintiff's affidavit at ECF No. 103 at 16-17 is a duplicate of the affidavit at ECF No. 102-1.

1   placed in mechanical restraints and escorted to Bravo program office along with Beltran.  "Later,"

2   defendant Hanks conducted a brief review into "our safety concerns and housing needs."  (ECF

3   No. 102-1 at 2.)  Plaintiff claims he informed Hanks that plaintiff was incompatible with Beltran,

4   and that Beltran had attempted to fight and block cell door 116.  Plaintiff states that Hanks

5   "determine[d] after interviewing both inmates," that Beltran "posed a serious threat against

6   [plaintiff's] safety and authorized Beltran be separated from . . . building one, transferred to a

7   different . . . building."  (ECF No. 102-1 at 2.)  Plaintiff states he does not recall having signed a

8   compatibility chrono before leaving the Bravo program office.  (Id.)

9   　　　　Response to Sur-Reply

10   　　　　Defendants were allowed to respond.  (ECF No. 109.)  In response, defendants argue that

11   the undisputed evidence establishes that the April 10, 2011 incident between plaintiff and Beltran

12   did not result in an enemy designation.  Defendants reject plaintiff's declaration that Hanks

13   "determined" that inmate Beltran posed a threat to plaintiff because plaintiff "does not declare

14   what . . . Hanks said, but instead attempts to testify as to what . . . Hanks thought."  (ECF No. 109

15   at 2.)  Plaintiff admitted he refused his cell assignment before he knew who the new cell mate

16   would be.  (ECF No. 102, ¶ 6-7.)  When interviewed, plaintiff made vague statements that his

17   new cell mate was an enemy, even though he didn't know who was the cellmate.  Plaintiff

18   admitted he could not identify his alleged enemy when asked to do so.  Plaintiff admits that

19   defendants verified that the new cell mate, inmate Beltran, was not listed on plaintiff's enemy list.

20   (ECF No. 102, ¶ 31.)  The chrono drafted by Sgt. Hays and submitted by plaintiff establishes that

21   Beltran was never designated as plaintiff's enemy, plaintiff has a history of manipulating staff by

22   alleging false enemy concerns, and inmate Beltran confirmed that he and plaintiff were not

23   enemies and could live on the same facility.  (ECF No. 97-1 at 51.)  Thus, the evidence shows

24   defendants were not deliberately indifferent to plaintiff's safety because inmate Beltran was never

25   designated as plaintiff's enemy, and plaintiff submitted no evidence to suggest defendants had

26   any reason to believe Beltran was a danger to plaintiff.

27   　　　　As to the use of force, defendants note that in plaintiff's initial declaration and separate

28   statement of material facts, plaintiff did not address the use of force "other than a single

1   conclusory statement that he was assaulted by staff."  (ECF No. 109 at 3, citing ECF No. 98 at 1-

2   6.)  Moreover, at his deposition, plaintiff testified that defendants Green and Tancreto did not use

3   excessive force.  (ECF No. 109 at 3.)  As to the claims that defendants Glover, Giessner and Holt

4   used excessive force during the escorts to plaintiff's cell, the medical evidence demonstrates that

5   reasonable force was used to subdue plaintiff when he became resistive because he only suffered

6   minor injuries.  (ECF No. 109 at 3.)

7        As to plaintiff's state law claim for intentional infliction of emotional distress, plaintiff did

8   not oppose defendants' motion, and also failed to rebut evidence showing he failed to comply

9   with the California Government Claims Act.  (ECF No. 109 at 3.)

10        Finally, defendants reiterate that they are entitled to qualified immunity because no

11   reasonable officer would have believed that moving plaintiff to a cell with another inmate who

12   was not deemed a safety risk to plaintiff would violate a clearly established right because the

13   evidence establishes that

14           (1) none of the Defendants were involved in the prior Beltran
            incident; (2) inmate Beltran was not designated as Plaintiff's
15           enemy; (3) a compatibility review was conducted prior to the cell
            move; (4) Plaintiff could not identify inmate Beltran by name or
16           CDCR number; and (5) Plaintiff has a known history of making
            false enemy claims to manipulate staff.
17

18   (ECF No. 109 at 3-4.)

19   V.  <u>Legal Standard for Summary Judgment</u>

20        Summary judgment is appropriate when it is demonstrated that the standard set forth in

21   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

22   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

23   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]the moving party always bears the

24   initial responsibility of informing the district court of the basis for its motion, and identifying

25   those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

26   together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

27   of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting then-numbered

28   Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving

party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

11

1   trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

2   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

3   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

4   amendments).

5         In resolving a summary judgment motion, the court examines the pleadings, depositions,

6   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

7   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

8   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

9   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

10  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

11  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

12  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

13  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

14  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

15  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

16  trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

17        By contemporaneous notice provided on January 15, 2016 (ECF No. 96-1), plaintiff was

18  advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

19  Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

20  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

21  VI.  Facts[6]

22        Plaintiff is a California prison inmate confined at HDSP from 2008 to September of 2011.

23  Defendants were all employees at HDSP in June of 2011.  Plaintiff was housed with inmate

24  Beltran from March 27, 2011, until April 10, 2011.  On April 10, 2011, inmate Beltran was

25  removed from plaintiff's cell after receiving a rules violation report for resisting a peace officer

26

27  [6]  For purposes of the pending motion, the following facts are found undisputed, unless otherwise
    indicated.

28

1 requiring use of force.  The incident report reflects that on April 10, 2011, Officers Byers and

2 Esquival observed plaintiff and inmate Beltran standing in front of cell 116 yelling at each other.

3 The officers approached the inmates and observed inmate Beltran blocking plaintiff from entering

4 the cell.  Inmate Beltran suddenly stepped out of the cell door, faced plaintiff, and took a bladed

5 stance with his fist raised to chest level.  The officers ordered the inmates to get down, which

6 plaintiff did, but inmate Beltran did not.  In response, the officers sprayed inmate Beltran with OC

7 Spray.  Inmate Beltran did not return to be housed in the cell, and plaintiff later received a new

8 cellmate.  None of the defendants in this case were involved in the April 10, 2011 incident

9 between plaintiff and inmate Beltran.[7]  The incident of April 10, 2011, did not result in prison

10 staff making a determination that plaintiff and inmate Beltran were enemies.[8]  No notation

11 regarding the incident was made in plaintiff's central file, and inmate Beltran was not listed as an

12 enemy on Form 812 in plaintiff's file.  (ECF No. 96-9 at 2.)  The April 10, 2011 incident did not

13 require that plaintiff and Beltran be listed as enemies.  (ECF No. 96-11 at 4.)

14          On the morning of June 4, 2011, Officer Fanning informed plaintiff he would be moving

15 cells.  When defendant Green came to plaintiff's cell, plaintiff asked Green if he knew who was

16 the inmate in cell 202, but Green did not.  (ECF Nos. 41 at 4; 102 at 2.)  Plaintiff told Green that

---

17 [7]  Plaintiff claims that Hanks reviewed the incident report, "responded as a facility supervisor due

18 to a code alarm being activated at complex Building One" (ECF No. 102 at 1), and, after the
incident, ordered plaintiff to return to his building unit.  The report confirms that defendant Hanks

19 was not involved, but did review the written incident report.  (ECF No. 98 at 12-26.)  Moreover,
even if Hanks responded to an alarm, plaintiff adduced no evidence as to when the alarm

20 sounded.  The report reflects the code 1 issued after Beltran was pepper sprayed and assumed a
prone position on the cell floor.  (Id.)  Thus, the incident between plaintiff and Beltran was over

21 before the alarm sounded, and Hanks would have arrived after Beltran returned to the cell.  (Id.)

22 [8]  Plaintiff declares that Hanks "later conducted a brief administrative review into our safety

23 concerns and housing needs," and determined, "after interviewing both inmates, it was deemed
inmate Beltran posed a serious threat against [plaintiff's] safety and authorized Beltran be . . .

24 transferred to a different complex building."  (ECF No. 103 at 17.)  Beltran was transferred, but
plaintiff points to no evidence documenting Beltran posed a "serious threat" to plaintiff.  The

25 incident report does not state Beltran was deemed a threat to plaintiff's safety, and plaintiff
provides no chrono or other evidence documenting such finding.  Plaintiff provides no specifics

26 as to when this "brief" review with Hanks took place, and does not set forth what defendant
Hanks said.  But in any event, plaintiff's allegations, taken as true, do not rebut the evidence that

27 the incident did not require listing Beltran as an enemy and was not listed as an enemy on

28 plaintiff's form 812 on June 4, 2011.

1   plaintiff is "going to refuse to accept [the inmate] as a cellmate." (ECF No. 109-2 at 10 (Pl.'s

2   Depo at 49.)  During the first escort, plaintiff informed both defendants Green and Tancreto that

3   plaintiff would be refusing his new cellmate.  (ECF No. 109-2 at 11.)  At this point, plaintiff did

4   not know who the cellmate was going to be.  Defendant Tancreto determined that plaintiff should

5   be sent to the program office based on plaintiff's claims that he would refuse his unknown

6   cellmate due to enemy concerns.  Defendants Green and Tancreto escorted plaintiff to the B

7   program office without incident.

8          Defendant Hanks interviewed plaintiff regarding his enemy concerns.  Plaintiff could not

9   recall inmate Beltran's name during the interview.  Plaintiff was unable to provide any

10  information as to an enemy concern, including a name or CDCR number of any alleged enemy.

11  During the interview, defendants Hanks and Fackrell did not tell plaintiff who was the inmate in

12  cell 202.  (ECF No. 96-4 at 14 (Pl.'s Depo. at 60).)

13         Defendant Hanks documented his conversation with plaintiff in a chrono dated June 5,

14  2011.[9]  (ECF No. 96-11 at 6.)  The chrono reflects that plaintiff told Hanks that plaintiff could

15  only live safely with one inmate on Facility B -- his former cellmate, and that unless he was living

16  with his former cellmate, plaintiff would be in fear for his safety.  Defendant Hanks told plaintiff

17  that he cannot use safety concerns to facilitate cell moves, and that if he wanted to live with a

18  certain inmate, he should complete a bed move request.  (Id.)

19         Prior to any cell move taking place, a compatibility review is conducted to ensure the

20  inmates are compatible.  The review consists of checking the inmates' confidential files, the Form

21  812 (form that identifies enemies), gang affiliation, and inmate's integrated housing code.  A

22  review of plaintiff's Form 812, enemy identification form, indicates that inmate Beltran is not and

23  was not identified as plaintiff's enemy.  (ECF No. 96-11 at 3.)

24         Because plaintiff did not have verifiable enemy concerns, he was cleared to return to his

25  assigned cell.  Staff attempted to escort plaintiff to his assigned cell two more times, but plaintiff

26  ───────────────

    [9]  Defendant Hanks incorporated the statements into his declaration and appended the chrono.

27  (ECF No. 96-11.)  In plaintiff's declaration, plaintiff includes statements he claims were made
    during the interview, but he does not deny the statements attributed to plaintiff in the June 5, 2011

28  chrono.  (ECF No. 102 at 3-5.)

refused to accept the assigned cell.

Around 10:50 a.m., during the second escort, defendants contend plaintiff resisted the escort by defendants Holt and Green.  Plaintiff claims he was not resisting, but that he was walking normally, and defendant Holt was pulling and pushing plaintiff.  Plaintiff was forced to the ground and secured with restraints.

The specific facts surrounding the use of force by defendant Holt during this second escort are disputed.  However, plaintiff admits that defendants Green and Tancreto did not use force against him or assault him.  After the use of force following the second escort, defendant Tancreto placed plaintiff's ankles in leg restraints.

Plaintiff was examined by Licensed Vocational Nurse ("LVN") Disterheft who examined plaintiff and noted abrasions to his forehead, shoulder and knees.  (ECF No. 96-5 at 1-2, 4.)  No other injuries were noted.  LVN Disterheft also noted that plaintiff reported "he was thrown down to ground while on escort."  (ECF No. 96-5 at 1, 4.)

Plaintiff was placed in a holding cell without further incident and then defendant Hanks conducted a use-of-force interview with plaintiff.  After the interview, plaintiff was cleared to return to his assigned cell.

Around 12:40 p.m., defendants Glover and Giessner were assigned to escort plaintiff to his assigned cell.  The specific facts surrounding what happened when this third escort arrived at cell 202, as well as the use of force by Giessner and Glover during the third escort, are also disputed.

Plaintiff told defendant Hanks that inmate Beltran, who was the inmate in cell 202, tried to "bomb" him, meaning he tried to attack him.  Whether or not the door to cell 202 was fully opened,[10] it is undisputed that plaintiff and Beltran had no physical contact on June 4, 2011.

_____

[10]  Defendants argue that the cell door was never opened.  (ECF No. 100 at 2.)  However, plaintiff declares that the cell door was open; defendant Giessner declares he asked Officer Abbott to open the door, without addressing whether the door was open at any point.  (ECF No. 96-8 at 1.)  Defendant Glover states that "as the door started to open," plaintiff said "I ain't going in there." (ECF No. 96-12 at 2.)  Defendant Hanks declares that defendant Giessner reported the cell door was "never opened;" although the "control booth Officer Abbott had unlocked the door, the door was never physically moved to the open position."  (ECF No. 96-11 at 3.)  Plaintiff declares that

Once plaintiff was secured, LVN Temple examined plaintiff and noted an abrasion on plaintiff's back, and several old abrasions or wounds to his forehead, shoulder, and knees.  (ECF No. 96-6 at 1-2, 4.)  LVN Temple's report also identified "pain" as an injury, without any further description or elaboration, either in the report or in the LVN's declaration.  (ECF No. 96-6 at 4.)

Defendant C. Fackrell vaguely recalls the June 4, 2011 incident, but did not draft a report. Rather, his brother, P. Fackrell of ISU, drafted a report.

Plaintiff did not file a claim with the Government Claims Board.

VII.  Plaintiff's Claims

A.  Alleged Deliberate Indifference to Plaintiff's Safety

1.  Eighth Amendment Standards

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  Id. at 833; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005).  The failure of prison officials to protect prisoners from attacks by fellow prisoners or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met:  (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to prisoner safety.  Farmer, 511 U.S. at 834; Hearns, 413 F.3d at 1040-41.  For a prison official to be held liable under the Eighth Amendment, the official "must know[ ] of and disregard[ ] an excessive risk to prisoner health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837; see Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1187-88 (9th Cir. 2002) (same).

The party claiming an Eighth Amendment violation "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Farmer,

Giessner opened and closed the cell door.  (ECF No. 102 at 12-13.)

511 U.S. at 842 (citation omitted).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id.

The Supreme Court further explained that the "obviousness of a risk" is not conclusive, and a prison official may demonstrate that the obvious escaped him.  Farmer, 511 U.S. at 843, n.8 (citation omitted).  But a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. . . ."  Id.  Also, a prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."  Id. at 844.  The ultimate test is whether the prison official acted reasonably in light of his knowledge; if he did, he is not liable under the Eighth Amendment even if the prisoner is harmed.  Id.

        2.  Discussion

Plaintiff's allegations that defendants failed to protect him on June 4, 2011, are unavailing for several reasons.  First, plaintiff failed to adduce competent evidence that inmate Beltran posed a serious threat to plaintiff's safety.  Inmate Beltran was not listed as an enemy on plaintiff's 812 form on June 4, 2011.

Second, plaintiff concedes that he refused his cell assignment before he knew who the new cellmate would be.  (ECF No. 102 at 2; 109-2 at 10 (Pl.'s Depo. at 49).)  It is undisputed that on June 4, 2011, plaintiff initially could not identify Beltran's name or provide any other identifying information concerning a serious threat of harm.  In his deposition, plaintiff conceded that, during the first escort and the interview with defendants Hanks and Fackrell, plaintiff did not know who was housed in cell 202, and could not recall the name of the inmate he believed to be his enemy.  (ECF No. 96-4 at 14 (Pl.'s Depo. at 51, 60).)  Plaintiff concedes it was not until the second escort with defendant Holt that plaintiff recalled the name of inmate Beltran.

Third, plaintiff's claim that defendants should have been aware that Beltran was plaintiff's

enemy from the events of April 10, 2011, is similarly unavailing.  The April 10, 2011 incident did not result in an enemy designation.  Defendants adduced evidence that such conflict, by itself, was not sufficient to require that Beltran be listed as an enemy of plaintiff, and also did not preclude housing such inmates in the same facility, building, or cell in the future.  (ECF No. 96-11 at 4.)  This one incident, standing alone, was insufficient to raise an inference that assigning plaintiff and Beltran to the same cell in the future would create a risk of serious harm, especially when their central files do not indicate enemy concerns.  Moreover, a prison official must have more than a "mere suspicion" that an attack will occur before he is required to take action to protect an inmate.  Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986).  Thus, plaintiff's argument that such an "inference" should have been made, based on the prior April 10, 2011 incident, is unavailing.

Fourth, despite plaintiff's claim that during his subsequent rules violation report hearing, he asked Chief Deputy Warden Gower to put inmate Beltran on plaintiff's 812 Form (ECF No. 102 at 16-17), such subsequent communication with Gower, who is not a defendant, fails to demonstrate that the named defendants were aware of a serious threat of harm on June 4, 2011.

Fifth, Beltran is currently not listed as an enemy of plaintiff.  (ECF No. 96-11 at 3.) Plaintiff did not rebut this evidence with competent evidence demonstrating that Beltran poses a serious threat to plaintiff's safety even now.  Rather, plaintiff provided an informational chrono by Correctional Sergeant T. Hays to the contrary.  (ECF No. 97-1 at 51.)  On June 11, 2011, Sgt. Hays investigated plaintiff's allegation made during a June 9, 2011 classification hearing that plaintiff had an enemy concern at HDSP, and found that plaintiff "did not provide any specific information relating to why he considered Beltran to be an enemy."  (ECF No. 97-1 at 51.)  Sgt. Hays reviewed plaintiff's central file and found:

> Inmate Ware has continuously refused to appropriately house with other SNY inmates at Kern Valley State Prison, Mule Creek State Prison, and now currently at HDSP.  Inmate Ware consistently alleges that he and whomever inmate he is instructed to house with is incompatible and or he identifies that inmate as an enemy.  His refusal to appropriately house has created hardships on multiple facilities at multiple institutions.

(ECF No. 97-1 at 51.)  In addition, on June 11, 2011, Sgt. Hays interviewed inmate Beltran, who

18

1  stated he knows plaintiff, could live on the same facility and building unit as plaintiff, but would

2  not want to be housed in the same cell because of the issues plaintiff "has caused in the past;"

3  however, Beltran "does not consider Ware as an enemy."  (ECF No. 97-1 at 51.)  Plaintiff

4  provided no evidence to rebut Hays' findings.  Sgt. Hays concluded that plaintiff was "again

5  attempting to manipulate staff by alleging false enemy concerns which has, and is, preventing

6  staff from appropriately housing him with compatible inmates."  (Id.)  Plaintiff's initial

7  statements during the first escort and to defendant Hanks support a finding that plaintiff was also

8  attempting to manipulate staff on June 4, 2011.

9         For the above reasons, no reasonable jury could find that any of the defendants failed to

10 protect plaintiff from a serious risk of harm on June 4, 2011.  Defendants are entitled to summary

11 judgment on such claims.

12        B.  Alleged Excessive Force

13             1.  Defendants Green and Tancreto

14        As set forth above, plaintiff conceded in his deposition that defendants Green and

15 Tancreto did not use excessive force on June 4, 2011.  Thus, defendants Green and Tancreto are

16 entitled to summary judgment on this claim.

17             2.  Defendants Holt, Giessner, and Glover

18        Defendants Holt, Giessner, and Glover argue that plaintiff resisted during the second and

19 third escorts, and in response, they used reasonable and minimal force to maintain order.

20 Defendants contend that the two medical exams revealed only minor injuries -- abrasions, which

21 supports the likelihood that the force used was minimal, reasonable, and not repugnant to

22 mankind.  On the other hand, plaintiff claims each defendant used excessive force.

23        Legal Standards

24        "When prison officials use excessive force against prisoners, they violate the inmates'

25 Eighth Amendment right to be free from cruel and unusual punishment."  Clement v. Gomez, 298

26 F.3d 898, 903 (9th Cir. 2002).  In order to establish a claim for the use of excessive force in

27 violation of the Eighth Amendment, a plaintiff must establish that prison officials applied force

28 maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore

discipline.  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  In making this determination, the court may evaluate (1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of a forceful response.  Id. at 7.  In 2010, the United States Supreme Court reiterated that the Eighth Amendment may be violated by use of excessive force against a prison inmate "'[even] when the inmate does not suffer serious injury.'"  Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (quoting Hudson, 503 U.S. at 4).  While the extent of an inmate's injury is relevant to the Eighth Amendment inquiry, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts."  Wilkins, 559 U.S. at 38.

### a. Defendant Holt

#### i. Plaintiff's Declaration

Plaintiff declares that around 10:47 a.m. on June 4, 2011, defendant Fackrell authorized defendants Green and Holt to transfer plaintiff "in mechanical restraints in a two-on-one physical control hold escort."  (ECF No. 102 at 5-6.)  Plaintiff declares that after this second escort exited the Bravo patio gate, plaintiff recalled Beltran's name, and told defendant Holt that Beltran was pepper sprayed after he refused to let plaintiff enter the cell because Beltran was trying to assault plaintiff.  (ECF No. 102 at 6.)  Defendant Holt allegedly answered, "Why didn't you report it to the supervisors," "I don't give a fuck," and "why you telling me?"  (Id.)  The second escort continued, and defendants Holt and Green were pushing and pulling against plaintiff as he walked normally.  Plaintiff claims his feet were sliding over the loose gravel, and Holt said "stop resisting."  (Id.)  Defendant Holt was pulling and pushing plaintiff's arms, and Holt became angry, his face got red, and he abruptly pushed plaintiff forward, letting go of the mechanical restraints.  (ECF No. 102 at 7.)  Plaintiff saw Holt make a closed fist as if to punch plaintiff, so plaintiff bent at the waist to avoid the strike, causing plaintiff's arms to raise.  Defendant Holt then secured his hold on plaintiff's arms and ordered plaintiff to stop walking and not to stop the escort.  Plaintiff protested that he was not resisting, but that Holt was pushing.  Defendant Holt quickly gripped plaintiff's arms and, without warning, told defendant Green, "take him down."  (ECF No. 102 at 7.)  Holt pulled plaintiff at the right elbow toward Holt while simultaneously

1   kicking plaintiff in the right and left heel, forcibly causing plaintiff's body to be lifted off the

2   ground.  Plaintiff lost his balance and was lifted into the air by Holt and Green.  (ECF No. 102 at

3   8.)  Holt placed his left hand behind plaintiff's head, pushed down, and both became airborne,

4   and plaintiff fell on to the ground, head first.  Plaintiff felt a sharp crack sound at the base of his

5   skull, saw a bright white flash of light, felt "unconscious" and "out of breath."  (ECF No. 102 at

6   8.)  Plaintiff shook his head, spit out dirt, and saw defendant Holt was lying beside plaintiff.

7   Defendant Holt looked into plaintiff's face and, using Holt's left hand, banged plaintiff's head

8   into the ground twice with a lot of force, causing plaintiff more pain, including loss of hearing in

9   his ears.  (ECF No. 102 at 8.)  Without warning, defendant Holt punched plaintiff in the right

10   lower jaw, forcibly making contact with his neck and collarbone, and Holt said, "stop resisting."

11   (ECF No. 102 at 8.)  Plaintiff responded that he could not breathe and had pain in his head and

12   chest.  Defendant Holt struck plaintiff in the hip twice with Holt's left elbow, pushed himself off

13   the ground, and then Holt forcibly pulled plaintiff's fingers apart, causing a lot of pain in

14   plaintiff's wrists.  (ECF No. 102 at 9.)  Plaintiff claims defendant Holt responded, "Shut the fuck

15   up.  Let me see you file a 602 against me."  (Id.)  As plaintiff lay face down on the ground,

16   squirming in pain, defendant Holt stood up and stomped down on the back of plaintiff's right

17   knee and calf, causing injury, and twice yelling, "stop resisting."  (Id.)

18       After plaintiff was placed in the holding cage, LVN Disterheft arrived, and plaintiff,

19   holding his head, told the LVN that he had severe pain in his skull which felt like his head might

20   explode, and claimed he was "bleeding from his head and various part of his body."  (ECF No.

21   102 at 9.)  The LVN began taking a medical statement, and plaintiff asked the LVN for x-rays  for

22   his severe pain in his head and chest.  (ECF No. 102 at 10.)  The LVN told plaintiff that he first

23   needed to treat plaintiff's injuries, and would call Dr. Lankford about plaintiff's pain.  Defendant

24   Fackrell interrupted, informing the LVN a full statement could not be taken because a use of force

25   interview must be completed first.  (ECF No. 102 at 10.)

26                    ii.  Defendants' Declaration

27       Defendants do not provide a declaration from defendant Holt.  Defendant Green declares

28   that during the escort, he was on plaintiff's left side, and defendant Holt was on plaintiff's right

1    side.  (ECF No. 96-7 at 1.)  Just as they entered the yard, plaintiff started to resist the escort by

2    stiffening his legs and turning toward his right.  Green pulled up on plaintiff's left arm with

3    Green's right hand pushing down on plaintiff's left shoulder with Green's left hand forcing

4    plaintiff to the ground.  Green maintained control of plaintiff's left arm while Holt maintained

5    control of plaintiff's right arm, keeping plaintiff on the ground until responding staff arrived.

6    Green declares that the force was applied in good faith to restore order, was reasonable, minimal,

7    and in accordance with CDCR policies and procedures.  (ECF No. 96-7 at 2.)

8                        iii.  Discussion

9            The parties' versions of the second escort differ sharply with regard to the amount of force

10    used by Holt on June 4, 2011.  Plaintiff's allegation that Holt caused plaintiff to be dropped face

11    first on to the ground, along with plaintiff's claim he was in mechanical restraints and not

12    resisting, followed by the alleged strikes once plaintiff was on the ground, could constitute

13    excessive force if believed by a jury.  Thus, summary judgment is not appropriate as to defendant

14    Holt.

15            Defendants argue that plaintiff's injuries following this escort were minor, and the LVN's

16    report notes only abrasions.  Plaintiff claims that the LVN's medical report[11] was interrupted for

17    the use of force interview, suggesting that not all of his injuries were recorded.  Moreover,

18    because there was a second use of force within hours of Holt's use of force, and the subsequent

19    medical report notes pain, absent additional facts not present here, the court cannot find that

20    Holt's use of force was minimal based solely on LVN Disterheft's report, particularly in light of

21    plaintiff's allegations.

22            Thus, if plaintiff's version of the second escort and the use of force by Holt are taken as

23    true, a reasonable jury could find that defendant Holt used excessive force under the

24    _____

25    [11]  In his verified opposition, plaintiff states that his injuries were videotaped.  (ECF No. 99 at 25-
26, 63; see also ECF No. 97 at 29-30.)  However, in his "perfected declaration," he states that his

26    refusal to have the use of force interview held at the holding cage was videotaped.  (ECF No. 102
at 10.)  Plaintiff then describes his removal from the holding cage:  he was required to strip out,

27    and sent to the sergeant's office to complete a confidential interview.  (Id. at 11.)  But he does not
describe in his "perfected declaration" a videotaping of his injuries sustained during the second

28    escort.  (ECF No. 102 at 10-11.)  No party submitted a videotape for the court's review.

1    circumstances.  Accordingly, defendant Holt is not entitled to summary judgment.

2                            b.  <u>Defendants Giessner and Glover</u>

3                                  i.  <u>Plaintiff's Declaration</u>

4         Prior to the third and last escort, plaintiff declares that defendant Fackrell "instructed

5    defendants Giessner and Glover how to transfer [plaintiff] in handcuffs authorizing a two-on-one

6    physical control hold escort," and Fackrell advised them:  "If he gives you any problems take him

7    down to the ground til we get there."  (ECF No. 102 at 11.)  Once the escort reached cell 202,

8    Giessner and Glover forced plaintiff into cell 202, despite plaintiff's objection that Beltran was

9    the inmate plaintiff previously got into a fight with.  (ECF No. 102 at 13.)  Plaintiff claims

10   Beltran said "you're not my cellie," moved toward plaintiff in an aggressive manner, lifting his

11   right hand, and Beltran blocked the entrance.  (ECF No. 102 at 13.)  Plaintiff moved away to his

12   right without resisting Giessner, and Giessner grabbed plaintiff's right arm with both hands.

13   Giessner quickly grabbed and closed the cell door.  Defendants Giessner and Glover ordered

14   plaintiff to face the wall.  Plaintiff said, "You see officer he tried to assault me," but Giessner

15   ordered plaintiff to face the wall.  The defendants discussed whether to take plaintiff back to the

16   program office, but Giessner said, "I know what I'm going to do," and "fuck him, he didn't do

17   nothing," and without warning yelled, "get down."  (ECF No. 102 at 14.)  Plaintiff was yanked

18   off the wall by his right arm, with Glover holding plaintiff's wrist and forearm.  Plaintiff believed

19   he was going to collide with the upper tier rails.  Both defendants moved plaintiff's body closer to

20   the rails, lifting him off the ground.  Plaintiff said, "I'm going to hit the rails," but defendant

21   Giessner continued to move plaintiff toward the rails, which caused Glover to release plaintiff's

22   arm, causing plaintiff to "fall to the ground pushing down on [his] left shoulder, and head

23   lounging on top of [plaintiff]."  (ECF No. 102 at 14.)  Glover quickly put his left knee on the side

24   of plaintiff's head and applied a lot of force, balancing his entire body weight moving back and

25   forth on the base of plaintiff's temple, and pushing down on plaintiff's left jaw using Glover's

26   right hand, causing plaintiff a lot of pain to his head, brain and neck.  Plaintiff began squirming

27   uncontrollably on the floor, stating "you're crushing my skull," and "you're hurting me."  (<u>Id.</u>)

28   Meanwhile, defendant Giessner struck plaintiff in the right hip with a pair of handcuffs, and

pushed plaintiff's lower body toward defendant Glover as plaintiff was pinned down at the temple causing pain in his spine, neck, and chest.  (ECF No. 102 at 14-15.)  Both defendants ordered plaintiff to put his hands behind his back.  Plaintiff complied, but continued to squirm due to the pain.  Giessner secured plaintiff's wrists.  (ECF No. 102 at 15.)  Plaintiff yelled that he could not breathe, and "had lung and heart surgery."  (Id.)  Defendant Glover continued to apply a lot of pressure to plaintiff's temple.  Giessner, squatting at his knees, secured plaintiff's right ankle with leg irons and then ordered plaintiff to "kick back your leg."  (Id.)  Plaintiff responded, "I can't, something is blocking my leg," and complained to Glover that plaintiff could not breathe, and "you're hurting my head," while plaintiff continued to squirm uncontrollably on the floor.  (Id.) Glover then moved his knee from plaintiff's head and put it on plaintiff's left shoulder.  (Id.)

ii.  Defendants' Declarations

After the third escort reached cell 202, defendants Giessner and Glover declare that after Giessner asked Officer Abbott to open cell door 202, plaintiff said "I ain't going in there."  (ECF Nos. 96-8 at 1, 96-12 at 2.)  At the time, defendant Giessner held plaintiff's right arm with Giessner's left hand just above plaintiff's right elbow, and plaintiff pushed his right shoulder into Giessner.  (ECF No. 96-8 at 2.)  Giessner grabbed the upper part of plaintiff's right arm with Giessner's right hand and used plaintiff's momentum to force his body to the ground.  (Id.) Defendant Glover had his right hand on plaintiff's left arm just above the elbow, and as Glover felt plaintiff tense up his left arm, Glover switched his left hand to plaintiff's left arm just above the elbow and put Glover's right hand around plaintiff's wrist and hand.  (ECF No. 96-12 at 2.) After plaintiff turned to his right, and as Giessner used his physical strength to turn plaintiff's body and pull plaintiff toward the ground, Glover maintained control of plaintiff's left arm as the defendants forced plaintiff to the ground.  (Id.)  After plaintiff was on the ground, Glover had control of plaintiff's left arm above his wrist with Glover's left hand, applying pressure to keep plaintiff's arm on the ground, and covering the left side of plaintiff's upper body with Glover's right arm and elbow to keep plaintiff from trying to lift off the ground .  (Id.)  Giessner maintained control of plaintiff's right arm with Giessner's right hand and right knee, securing plaintiff's arm to his back using Giessner's body weight.  (ECF No. 96-8 at 2.)

Giessner secured plaintiff's right hand in handcuffs while Glover maintained control of plaintiff's left arm.  (ECF Nos. 96-8 at 2; 96-12 at 2.)  After plaintiff's right hand was handcuffed, Glover pulled plaintiff's left hand back toward his right hand behind his back using Glover's left hand.  (ECF No. 96-12 at 2.)  Glover declares that Giessner took control of plaintiff's left hand, and Glover repositioned his hands and body with his left knee on the shoulder of plaintiff, and Glover's right hand on plaintiff's left hand, and Glover's left hand on plaintiff's shoulder.  (Id.)  Glover declares Giessner secured plaintiff's left hand in handcuffs.  (Id.)  Glover maintained control of plaintiff's upper body using his body weight.  (ECF Nos. 96-8 at 2; 96-12 at 2.)  Giessner let go of plaintiff's right arm and stood up.  (96-8 at 2.)  Glover declares that Officer Robinette took over for Giessner on plaintiff's right side, using Robinette's hands and body weight to secure plaintiff.  (ECF No. 96-12 at 2.)  While Giessner applied leg irons, Glover maintained control of plaintiff's upper body.  (Id.)  Giessner grabbed plaintiff's right foot with Giessner's left hand and secured the right leg in leg restraints.  (ECF No. 96-8 at 2.)  Glover was relieved by Officer Guzman, who took control of plaintiff's left side.  (ECF No. 96-12 at 2.)

When Giessner tried to grab plaintiff's left foot, plaintiff kicked back with his left leg, striking Giessner on the left side of the left calf with plaintiff's boot.  (ECF No. 96-8 at 2.)  Giessner grabbed plaintiff's left calf with Giessner's left hand and secured plaintiff's left leg in leg restraints.  (Id.)  At that time, Officer Robinette relieved Giessner.  (Id.)

Defendant Glover declares that he used the minimum amount of force necessary to regain control of plaintiff, and the force used was reasonable under the circumstances.  (ECF No. 96-12 at 3.)  Defendant Giessner declares that the force used was in good faith to restore order and was reasonable, minimal, and in compliance with CDCR policies and procedures.  (ECF No. 96-8 at 2.)

### iii.  Discussion

Plaintiff's version of the events at cell 202 differs dramatically from the version of defendants Giessner and Glover.  Importantly, plaintiff suggests that the use of force was not necessary; that there was a gap in time between the closing of the cell door and when defendant Giessner allegedly decided to take plaintiff down.  In addition, plaintiff alleges that Glover used

1   excessive force in applying his knee to plaintiff's temple after plaintiff was on the ground, in

2   contrast to defendants' contention that their body weight pressure was applied to plaintiff's back

3   and shoulder.  Plaintiff also claims defendant Giessner struck plaintiff in the right hip with a pair

4   of handcuffs.

5       In his June 24, 2015 deposition, plaintiff stated that Giessner did not assault or hit

6   plaintiff:  "All he did was drop me on the ground.  That was it.  Yanked me off the wall and

7   dropped me on the ground."  (ECF No. 109-2 at 17.)  If this were plaintiff's sole allegation as to

8   defendant Giessner, he might be entitled to summary judgment.  However, plaintiff's declaration

9   contains additional facts not addressed in the testimony provided.  Also, the deposition testimony

10  provided appears to be at the end of plaintiff's testimony concerning the third escort, and no

11  previous pages concerning the third escort were submitted.  (See ECF Nos. 96-4 at 4-16; 109-2 at

12  4-18.)

13      Finally, defendants argue that because plaintiff suffered only minor injuries, a lack of

14  evidence supports his claim.  This argument is unpersuasive.  As noted above, LVN Temple's

15  medical report reflects that plaintiff reported suffering pain.  With his motion for partial summary

16  judgment, plaintiff provided additional records describing his ongoing pain following the use of

17  force on June 4, 2011, including inmate appeals attempting to gain medical care thereafter.  (ECF

18  No. 97 at 47-78.)  Plaintiff was taken to B Clinic following after the third escort use of force, and

19  no loss of consciousness was reported.  (ECF No. 97 at 48.)  Plaintiff complained of pain to his

20  face and neck.  (ECF No. 97 at 50.)  Plaintiff was given a shot of Toradol and prescribed

21  Ibuprofen, 400 mg. for 17 days.  (ECF No. 97 at 52.)  On June 8, 2011, plaintiff completed a

22  health care services form, seeking x-rays that had been approved but not completed, and renewed

23  his complaints of sharp pain to his head, eye brow, cheek, jaw, chin, shoulder, collar bone, ribs,

24  hips, knees and ankles.  (ECF No. 97 at 54.)  On June 14, 2011, plaintiff was examined for his

25  complaints, and reported having left collar bone pain and difficulty catching his breath.  (ECF No.

26  97 at 66.)  The routine chest x-ray noted mild chronic changes at the left lung base with mild

27  hyperinflation of the lungs, but no evidence of rib fractures, hemothorax or pneumothorax.  (ECF

28  No. 97 at 68.)  On August 2, 2011, plaintiff was examined for complaints of headaches and

1    hurting collar bone.  (ECF No. 97 at 72.)  The doctor ordered x-rays, and assessed plaintiff as

2    having chronic headaches.  (ECF No. 97 at 72.)  On August 9, 2011, plaintiff was examined for

3    pain in his right clavicle, shoulder and hip, with throbbing over right frontal area where he hit the

4    ground.  (ECF No. 97 at 75.)  The August 12, 2011 x-rays reported no fractures of the skull or

5    right hip, and no soft tissue swelling in the skull.  (ECF No. 97 at 77, 78.)

6            Thus, in light of plaintiff's pain complaints, the undersigned cannot agree that plaintiff

7    suffered only minor injuries sufficient to suggest the use of minimal force.  In any event, the

8    extent of injury is only one factor that suggests whether the force used was excessive.  See

9    Hudson, 503 U.S. at 7.  As noted above, injury and force are only imperfectly correlated, and it is

10   the latter that ultimately counts.  See Wilkins, 559 U.S. at 36-38 (inmate who was gratuitously

11   beaten by guards did not lose his ability to pursue excessive force claim merely because he had

12   the good fortune to escape without serious injury).

13           Taking the evidence submitted by plaintiff as true, and drawing all inferences in plaintiff's

14   favor, as required on defendants' motion for summary judgment, there are triable issues of fact as

15   to whether defendants' use of force was excessive.

16           C.  State Law Claim

17           Plaintiff included an emotional distress claim which this court construed as a state law

18   claim.  (ECF No. 43 at 2, n.1.)  Plaintiff alleged that defendants intentionally caused plaintiff

19   serious emotional damage by their acts or omissions on June 4, 2011.  (ECF No. 41 at 17.)

20           The California Government Claims Act requires that a tort claim against a public entity or

21   its employees be presented to the California Victim Compensation and Government Claims

22   Board (VCGCB), formerly known as the State Board of Control, no more than six months after

23   the cause of action accrues.  Cal. Gov't Code §§ 905.2, 910, 911.2, 945.4, 950-950.2 (West).  A

24   plaintiff is barred from filing a lawsuit against a public entity if he fails to timely present a claim

25   for money or damages to that entity.  State v. Superior Court (Bodde), 32 Cal. 4th 1234, 1239

26   (2004).  Presentation of a written claim, and action on or rejection of the claim are conditions

27   precedent to suit, and an element of the cause of action.  Bodde, 32 Cal.4th at 1239; Shirk v. Vista

28   Unified School District, 42 Cal. 4th 201, 209 (2007); Mangold v. California Public Utilities

1   Comm'n, 67 F.3d 1470, 1477 (9th Cir. 1995).  To state a tort claim against a public employee, a

2   plaintiff must allege compliance with the California Tort Claims Act. Cal. Gov't Code § 950.6;

3   Bodde, 32 Cal. 4th at 1243.  "[F]ailure to file a claim is fatal to a cause of action."  Hacienda La

4   Puente Unified School Dist. Of Los Angeles v. Honig, 976 F.2d 487, 495 (9th Cir. 1992); City of

5   Stockton v. Superior Court, 42 Cal. 4th 730, 738 (2007).

6           Here, plaintiff failed to allege compliance with the California Government Claims Act.  In

7   their motion, defendants provided a declaration from the VCGCB stating that no claims were

8   filed or presented by plaintiff from January 1, 2011, through January 1, 2013.  (ECF No. 96-13 at

9   1.)  Plaintiff did not rebut this evidence.  Accordingly, plaintiff's state law claim should be

10  dismissed.

11  VIII.  Qualified Immunity

12          In their motion, defendants seek qualified immunity as to all of plaintiff's claims.  (ECF

13  No. 96-2 at 10.)  Defendants contend that no reasonable officer in their positions would believe

14  that moving plaintiff to a cell with another inmate who was not deemed a safety risk to plaintiff

15  would violate a clearly established right where (1) no defendant was involved in the April 10,

16  2011 incident; (2) inmate Beltran was not designated as plaintiff's enemy; (3) a compatibility

17  review was conducted prior to the cell move; and (4) plaintiff could not identify Beltran by name

18  or CDCR number.  (Id.)

19          "Qualified immunity gives government officials breathing room to make reasonable but

20  mistaken judgments. . . .  When properly applied, it protects 'all but the plainly incompetent or

21  those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting

22  Malley v. Briggs, 475 U.S. 335, 341 (1986)).  In deciding whether a government official is

23  entitled to qualified immunity, the Supreme Court has articulated a two-prong approach:  first,

24  whether the officer's conduct violated a constitutional right; and second, whether the officer's

25  conduct violated "clearly established law."  Pearson v. Callahan, 555 U.S. 223, 232, 243-44

26  (2009) ("The principles of qualified immunity shield an officer from personal liability when an

27  officer reasonably believes that his or her conduct complies with the law.").  "[J]udges of the

28  district courts . . . [are] permitted to exercise their sound discretion in deciding which of the two

1   prongs of the qualified immunity analysis should be addressed first."  Id. at 236.

2          In the Eighth Amendment deliberate indifference context, the Ninth Circuit has clarified

3   that "the qualified immunity inquiry is separate from the constitutional inquiry."  Estate of Ford v.

4   Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  To survive a motion for summary

5   judgment asserting qualified immunity on a "deliberate indifference claim," a prisoner plaintiff

6   must present sufficient evidence that "a reasonable officer" in defendants' position "would

7   necessarily have perceived . . . an excessive risk of serious harm."  Id. at 1051 (citing Saucier v.

8   Katz, 533 U.S. 194, 202 (2001)).  "[A] reasonable prison official understanding that he cannot

9   recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly,

10   but reasonably, perceive that the exposure in any given situation was not that high," in which

11   case, "he would be entitled to qualified immunity."  Estate of Ford, at 1050.

12          Generally, a prison official's housing decision does not violate the Eighth Amendment

13   merely because it increases the risk of harm to a prisoner; the decision is unconstitutionally

14   deliberately indifferent only if "the risk of harm from" the decision to house an inmate with other

15   dangerous inmates "changes from being a risk of some harm to a substantial risk of serious

16   harm."  Estate of Ford, 301 F.3d at 1051.  Further, a prison official is entitled to qualified

17   immunity for harm that arises from a housing decision if "a reasonable officer in [the defendant's]

18   position" would not have known that the decision "posed an excessive or intolerable risk of

19   serious injury."  Id. at 1052[12] (citing Farmer, 511 U.S. at 847 n.9).

20   ──────────────

21   [12]  In Estate of Ford, the family and estate of an inmate who was killed by his cellmate brought a
     failure-to-protect claim against the prison officials, arguing their decision to house the decedent
22   with a known "predator" was deliberately indifferent.  Id., 301 F.3d at 1047.  The cellmate in
     Estate of Ford, Diesso, was "characterized as 'extremely violent and dangerous,'" was involved
23   in a number of attacks on guards and other inmates, "was designated a 'predator,'" he "often
     requested to be celled with known homosexuals," and "wanted to cell with Ford but [prison
24   officials initially] did not allow it to happen." Id. at 1046.  The decedent, Ford, was "widely
     known to [prison] staff as an effeminate homosexual," but was not "classified as a 'victim.'"  Id.
25   at 1046-47.  Two weeks before Ford was transferred to Diesso's cell, Diesso was observed
     behaving strangely and was prescribed temporary medication.  Ford was transferred to Diesso's
26   cell, and, two days later, Diesso attacked and killed Ford.  Id. at 1047.  The district court
     concluded that genuine issues of material fact precluded summary judgment whether defendants
27   were deliberately indifferent to a substantial risk of harm to Ford, and denied qualified immunity;
     the Ninth Circuit reversed.  Id. at 1048, 1051-53.  The court concluded the prison officials were
28

1    Under these standards, each defendant is entitled to qualified immunity from liability

2    unless a reasonable officer in his position with the information he had would have perceived a

3    substantial risk of harm to plaintiff from housing him with Beltran.  The record does not reflect

4    that a substantial risk of harm in housing plaintiff with Beltran was known to the defendants on

5    June 4, 2011.  Even assuming defendant Hanks was aware of all the details of plaintiff's earlier

6    incident with Beltran in April, one such incident is insufficient to demonstrate a substantial risk of

7    harm would result from housing Beltran and plaintiff together in the future.  Thus, defendants are

8    also entitled to qualified immunity on plaintiff's claim that defendants failed to protect plaintiff

9    on June 4, 2011.

10    Despite claiming they seek qualified immunity on all of plaintiff's claims, defendants do

11    not address the issue of qualified immunity in the use of force context.  Rather, in their

12    subsequent replies, defendants claim they did not violate plaintiff's constitutional rights in

13    conjunction with his cell move.  (ECF Nos. 100 at 3; 109 at 3.)

14    The measuring rod for determining whether an official's conduct violates a plaintiff's

15    constitutional right was set forth by the Supreme Court in Ashcroft v. al-Kidd, 131 S. Ct. 2075,

16    2083 (2011):  "A Government official's conduct violates clearly established law when, at the time

17    of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

18    'reasonable official would have understood that what he is doing violates that right.'"

19    Lal v. California, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted).  As the Supreme Court

20    explained:

21

> "We have repeatedly told courts . . . not to define clearly
> established law at a high level of generality." Al-Kidd, supra, at
> 742, 131 S. Ct. 2074. The dispositive question is "whether the
> violative nature of particular conduct is clearly established." Ibid.
> (emphasis added). This inquiry "'must be undertaken in light of the
> specific context of the case, not as a broad general proposition.'"
> Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160
> L.Ed.2d 583 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S.
> 194, 201, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001)).

22

23

24

25

26

27    entitled to qualified immunity:  "Although [defendants'] decision[s] to . . . allow Diesso to be
     double-celled with Ford turned out to be quite unfortunate . . ., we cannot say that a reasonable
28    correctional officer would have clearly understood that the risk of serious harm was so high that
     he should not have authorized the double-celling." Id. at 1051.

1   Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).  Thus, the court must analyze qualified immunity

2   in the use of force context rather than in the broader cell move context.

3        The court finds that granting summary judgment on grounds of qualified immunity in the

4   use of force context would not be proper.  Resolving all factual disputes in plaintiff's favor at this

5   stage, the court concludes that if plaintiff's version of events is true, then defendants violated his

6   clearly established right to be free from excessive force.  See Martinez v. Stanford, 323 F.3d

7   1178, 1183 (9th Cir. 2003) ("the law regarding a prison guard's use of excessive force was clearly

8   established by 1994").  Granting summary judgment on the ground of qualified immunity is

9   "improper if, under the plaintiff's version of the facts, and in light of the clearly established law, a

10  reasonable officer could not have believed his conduct was lawful."  Schwenk v. Hartford, 204

11  F.3d 1187, 1196 (9th Cir. 2000).  See, e.g., Watts v. McKinney, 394 F.3d 710, 712-13 (9th Cir.

12  2005) (finding prison guard could not reasonably believe he could lawfully kick prisoner who

13  was on the ground and in handcuffs).

14       While resolution of the factual issues may well relieve defendants of any liability in this

15  case, if plaintiff's version of the facts were to prevail at trial, a reasonable jury could conclude

16  that defendants inflicted unnecessary and wanton force in violation of plaintiff's constitutional

17  rights.  Defendants Holt, Giessner, and Glover are therefore not entitled to summary judgment on

18  grounds of qualified immunity, in connection with plaintiff's excessive force allegations.

19  IX.  Conclusion

20       In light of the above, this action should proceed solely on plaintiff's claims that

21  defendants Holt, Giessner, and Glover used excessive force during escorts on June 4, 2011, in

22  violation of the Eighth Amendment.

23       In accordance with the above, IT IS HEREBY RECOMMENDED that:

24       1.  Plaintiff's motion for partial summary judgment (ECF No. 97) be denied;

25       2.  Defendants' motion for summary judgment (ECF No. 96) be granted in part and denied

26  in part, as follows:

27            a.  All defendants are entitled to summary judgment on plaintiff's claim that

28  defendants failed to protect him in violation of the Eighth Amendment;

        b.  Defendants Tancreto and Green be granted summary judgment on plaintiff's excessive force claims; and

        c.  The motion for summary judgment by defendants Holt, Giessner, and Glover, on plaintiff's excessive force claims be denied;

    3.  Defendants Green, Tancreto, Hanks, and Fackrell be dismissed from this action with prejudice; and

    4.  This matter be remanded to the undersigned for further scheduling.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 8, 2017

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/ware1505.msj